Submitted on remand from the United States Supreme Court April 21, vacated and
remanded in part; otherwise affirmed October 22, 2003

Arleen E. WADDILL,
*Respondent,*

*v.*

ANCHOR HOCKING, INC.,
a Delaware corporation,
*Appellant.*

9405-03390; CA A91012

78 P3d 570

Robert H. Riley, Catherine Masters Epstein, Neil Lloyd, Schiff Hardin & Waite, Chicago, Illinois, and Stephen S. Walters and Stoel Rives LLP, Portland, for appellant.

Kathryn H. Clarke , Maureen Leonard, and D. Lawrence Wobbrock, Portland, for respondent.

Thomas W. Brown, Cosgrave Vergeer Kester LLP, Andrew L. Frey, Evan M. Taber, Andrew H. Schapiro, Mayer Brown Rowe & Maw, and Robin S. Conrad, National Chamber Litigation Center, Inc., filed the brief *amicus curiae* for Chamber of Commerce of the United States of America.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.*

EDMONDS, P. J.

---

* Armstrong, J., *vice* Kistler, J., resigned.

**EDMONDS, P. J.**

This products liability case has been before us twice before. In our last opinion, we affirmed the trial court's judgment, based on the jury's verdict, that awarded plaintiff compensatory damages of $100,854 and punitive damages of $1 million. *Waddill v. Anchor Hocking, Inc.*, 175 Or App 294, 27 P3d 1092 (2001), *rev den*, 334 Or 260 (2002).[1] Thereafter, the United States Supreme Court granted defendant's petition for a writ of *certiorari*, vacated our decision, and remanded the case to us for reconsideration in light of *State Farm v. Campbell*, 538 US 408, 123 S Ct 1513, 155 L Ed 2d 585 (2003), the Court's most recent decision on punitive damages. On reconsideration, we again affirm the jury's decision to award punitive damages but conclude, on the basis of the federal standards that the Court has established, that the maximum permissible award is $403,416. We therefore order a new trial on punitive damages unless plaintiff agrees to a remittitur to reduce the award to that amount.[2]

We begin by considering several procedural issues that arise from defendant's arguments on remand. First, both defendant and *amicus curiae* Chamber of Commerce of the United States of America suggest that the Court's order granting *certiorari*, vacating our decision, and remanding the case to us (a GVR order) indicates its belief that our previous decision is probably erroneous. They rely primarily on *Lawrence v. Chater*, 516 US 163, 116 S Ct 604, 133 L Ed 2d 545 (1996), in which the Court entered a GVR order after the government, which had prevailed below, changed its position on the merits. In doing so, the Court described a number of developments that had led it to enter GVR orders, including new decisions of its own. *Id.* at 166-67. In his dissent, Justice Scalia described the issuance of GVR orders based on new

---

[1] In our first opinion, we reversed the judgment and remanded for a new trial without reaching a number of defendant's arguments. *Waddill v. Anchor Hocking, Inc.*, 149 Or App 464, 944 P2d 957 (1997). The Oregon Supreme Court reversed that decision and remanded for us to consider the issues that we had not reached. *Waddill v. Anchor Hocking, Inc.*, 330 Or 376, 8 P3d 200 (2000), *adh'd to on recons*, 331 Or 595, 18 P3d 1096 (2001). We did so in our second opinion, which the United States Supreme Court vacated and remanded.

[2] The Court's remand is limited to the punitive damages issue. We readopt our former opinion in all other respects, including its statement of the facts.

decisions as a "no-fault" practice that the Court applies when an intervening event has cast doubt on a lower court's decision concerning a federal question. *Id.* at 180 (Scalia, J., dissenting). The majority apparently agreed with Justice Scalia's description. *Id.* at 166. We do not take that statement to mean that the Court, when it enters a GVR order in that situation, has reached any conclusion concerning the merits of the lower court's action. Rather, the order indicates only that the intervening decision has changed the legal context in a way that, the Court believes, requires the lower court to determine whether its previous decision remains good law.

GVR orders like the one in this case make it unnecessary for the Court to decide multiple cases that raise similar issues, thus conserving its resources. They are different from a GVR order, such as the one in *Lawrence*, that the Court entered after the party that prevailed below changed its position on the merits and agreed that the lower court's decision was erroneous. In contrast, the GVR orders that the Court entered after *State Farm* in this and other cases indicate only that the cases involved the issue that the Court decided in *State Farm* and therefore require additional evaluation in light of that decision.

■    Defendant next argues that the Court's decisions in *State Farm* and *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 US 424, 121 S Ct 1678, 149 L Ed 2d 674 (2001), require us to review the jury's determination *de novo*, by which it appears to mean that we should engage in our own evaluation of the evidence to determine if the jury should have awarded punitive damages. As we explained in our previous decision in this case, 175 Or App at 302 n 5, and discussed at greater length in *Williams v. Philip Morris Inc.*, 182 Or App 44, 61-63, 48 P3d 824, *rev den*, 335 Or 142 (2002), *vac'd and rem'd*, ___ US ___ , 124 S Ct 56, 157 L Ed 2d 12 (2003), *Cooper Industries* does not stand for the proposition that defendant asserts. That is clear from the Court's statement in *State Farm* that *Cooper Industries Inc.* "mandated appellate courts to conduct *de novo* review of a trial court's application of" the appropriate standards "to the jury's award." 538 US at ___ , 155 L Ed 2d at 601. That is, the *de novo* review is review for errors of law of the trial court's evaluation of the jury's award for excessiveness; it is

not *de novo* review of the facts that the jury found that give rise to an award of punitive damages. *See Bocci v. Key Pharmaceuticals, Inc.*, 178 Or App 42, 50-51, 35 P3d 1106 (2001), *rev den*, 334 Or 260 (2002), *vac'd*, ___ US ___ , 123 S Ct 1781, 155 L Ed 2d 662, *on remand*, 189 Or App 349, 76 P3d 669 (2003).

■ The source of the problem with defendant's argument is that the Court, like many other federal courts, uses the phrase *"de novo* review" in a different way from how Oregon courts use it. In Oregon, *"de novo* review" remains tied to its origins in equity cases, which appellate courts tried anew upon the record; it thus refers to the review of factual findings. The phrase is inapplicable to actions at law, such as this case, in which there is the right to a jury trial on the facts. *See* ORS 19.415(1), (3); *Trabosh v. Washington County*, 140 Or App 159, 163 n 6, 915 P2d 1011 (1996). The Court, however, uses the phrase to refer to appellate review of the trial court's legal decisions; it contrasts that standard of review with review for abuse of discretion. With regard to punitive damages, it does so in the context of traditional restraints on federal appellate review of trial court decisions on compensatory damages. *See Williams*, 182 Or App at 62. The Court's distinction, thus, is comparable to the distinction that Oregon courts make between reviewing legal decisions for errors of law and reviewing them for abuse of discretion. *See* ORAP 5.45(5) n 2. When we review a decision for errors of law, we do not give any deference to the trial court's decision; thus, we review the trial court's decision *"de novo"* as the Supreme Court uses the phrase. That does not mean that we assume the jury's role and decide for ourselves, as a factual matter, whether punitive damages are appropriate or what the proper amount should be. Rather, we review the jury's decisions in those regards to determine whether, under the criteria that the Court has established, the awards are constitutionally permissible.

■ Finally, defendant fails to recognize that the jury decided the case in plaintiff's favor and that, as a result, we must resolve all disputed facts in favor of plaintiff. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). Rather, it states the facts as it wishes the jury had found them, downplays the seriousness of plaintiff's injuries, and

reargues a number of issues concerning the dangerousness of its product that the jury decided against it. We ignore those aspects of defendant's arguments. We also do not consider defendant's arguments concerning jury instructions that it never requested and other matters that it did not preserve at trial.

We summarize the facts as we described them in our previous opinion, stating them most favorably to plaintiff because of the verdict in her favor. Plaintiff suffered serious and permanent injuries to her arms and wrists when a glass fishbowl that defendant manufactured and that was filled with water shattered while she was carrying it. In her memorandum on remand, plaintiff accurately summarizes the evidence in the record concerning her injuries:[3]

> "Shards of glass slashed her ulnar artery, lacerated her ulnar nerve, and severed a tendon in her left wrist; she also had a partial laceration to her right index finger and the nerve and artery on its side. She was taken to the hospital by ambulance, where she underwent a three-hour repair surgery. She had to rely on medication for control of her pain for more than a month, during which time she was dependent on the assistance of other family members for all personal care. The ulnar nerve damage resulted in wasting of the muscle in her hand; as a result, when she is fatigued she lacks the muscle power to extend her fingers, and they involuntarily form a claw. She has difficulty moving her fingers in order to do simple hand movements, and has reduced sensitivity to touch; as a result she has difficulty doing anything that requires fine finger manipulation. * * * Her physician testified that these sequelae are permanent. She has abnormal sensitivities to heat and cold, which were disturbing her at the time of trial and which may persist for years and may be permanent. She has permanent scars."

The fishbowl shattered because of a small crack or ding that developed during normal use and that grew catastrophically because of the stresses that the fishbowl underwent as a result of being carried while filled. Plaintiff argued that a simple and inexpensive warning not to carry the fishbowl with water in it could have prevented her injuries.

---

[3] We have deleted plaintiff's references to the record.

Defendant was aware, as the result of legal actions against it, of three other incidents in which customers were injured by fishbowls that shattered. However, it did not retain records of those incidents or attempt to use them to improve the safety of its product. Defendant's product engineering manager was not even aware of the previous incidents. At the time of trial, defendant continued to destroy records that were more than five years old and was unaware of any market research concerning whether customers appreciate the latent hazards that might accompany the normal use of a fishbowl. *Waddill*, 175 Or App at 296, 304-05.

Based on those facts, the jury found both that defendant was negligent and that the fishbowl was dangerously defective because of the lack of an adequate warning. It also found that defendant was 75 percent and plaintiff was 25 percent at fault with regard to her injuries and that plaintiff's actual damages totaled $132,472. Finally, it awarded plaintiff $1 million in punitive damages. Based on the jury's verdict, the trial court entered judgment in plaintiff's favor for $100,854 in actual damages and $1 million in punitive damages. *Waddill*, 175 Or App at 296.

In our last decision, we affirmed the judgment in its entirety. In doing so, we reviewed the jury's decision to award punitive damages in accordance both with the criteria that *former* ORS 30.925(3) (1993)[4] establishes for awarding such damages in product liability cases and with the federal criteria as the Oregon Supreme Court interpreted them in *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 17 P3d 473 (2001). We first concluded, after reviewing the record, that the jury could reasonably have drawn inferences from the evidence that

---

[4] The criteria of *former* ORS 30.925(3) (1993) are now contained in ORS 30.925(2). The trial court summarized them in its instructions to the jury:

"Likelihood at the time of sale that serious harm would arise from defendant's misconduct; the degree of defendant's awareness of that likelihood; the profitability of the defendant's misconduct; the duration of the misconduct and any concealment of it; the attitude and conduct of the defendant upon discovery of the misconduct; the financial condition of the defendant; and the total deterrent effect of other punishment imposed on the defendant as a result of the misconduct."

These criteria provided the jury guidance in awarding punitive damages, something that, the Court believed, was missing in *State Farm*. *See* 538 US at _____ , 155 L Ed 2d at 601.

defendant acted with a conscious indifference to the possibility that the fishbowl it manufactured could injure someone during ordinary use and that that conscious indifference implied a wilful disregard of a known risk to consumer safety. We then examined the current state of the law in Oregon regarding when punitive damages are awardable in the context of a claim based on the negligent failure to warn of a defect in a product. Accordingly, we distinguished between ordinary negligence cases and cases where the evidence implies a wilful disregard of a known risk to consumer safety. We concluded that the evidence was sufficient to permit the jury to award punitive damages under the statute. *Waddill*, 175 Or App at 304-05.

In addition, we held that the amount of punitive damages was not excessive under the federal constitution. We pointed to the fact that punishing manufacturers who fail to investigate the safety of their products after learning of injuries that the products caused furthers the state interest of preventing injuries to Oregonians from defective products. Plaintiff's injuries were serious and her damages were substantial, and it is common knowledge that broken glass is dangerous and can cause serious injuries. Without emphasizing any particular ratio between actual and punitive damages, we noted that the punitive damages were no greater than ten times the actual damages that defendant caused. We were unwilling to say that the award was excessively disproportionate, particularly when there was evidence that the defendant consciously ignored indications that its product was unsafe. *Waddill*, 175 Or App at 305-06.

■■ On remand, we adhere to our previous conclusion that the judgment was consistent with Oregon law, including the rational juror standard first described in *Oberg v. Honda Motor Co.*, 320 Or 544, 551, 888 P2d 8 (1995), *cert den*, 517 US 1219 (1996), and shortly thereafter incorporated in ORS 18.537(2). We have also applied the standard required by Article VII (Amended), section 3, of the Oregon Constitution:

"No fact tried by a jury shall be otherwise reexamined by any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

The question, thus, is whether that application of Oregon law violates defendant's federally protected rights.

■ The Due Process Clause of the Fourteenth Amendment prohibits the award of an excessive amount of punitive damages against a tortfeasor because, to the extent that an award is excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property. *Cooper Industries, Inc.*, 532 US at 433. In *State Farm*, the Court held that an award of $145 million in punitive damages against an insurance company that had acted in bad faith in failing to settle a case was excessive. The compensatory damages in the case were $1 million. The Court reemphasized the factors that it had discussed in *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996), and concluded that the reprehensibility of the defendant's conduct did not justify punitive damages that were 145 times greater than the compensatory damages.

This case is not the first decision in which we have applied *State Farm* to a case on remand from the United States Supreme Court. In *Bocci* we recently discussed *State Farm* at some length. We held that an award of $22.5 million in punitive damages to a physician whom the defendant misled into believing that a prescription drug that the plaintiff was taking was not toxic, resulting in serious injury to the plaintiff, one of the physician's patients, was excessive and ordered a remittitur to $3.5 million. The physician's compensatory damages were $500,000. We followed the Court's approach in *State Farm* and began by evaluating the first *Gore* guideline, which involves the reprehensibility of the defendant's conduct. We concluded that the defendant's actions were reprehensible for a number of reasons under the criteria that *State Farm* described, which include whether

> "the harm caused was physical as opposed to economic; the tortious conduct evidenced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

538 US at ____ , 155 L Ed 2d at 602, *quoted in Bocci*, 189 Or App at 355. We held that the defendant's actions caused physical injury to the plaintiff as well as economic injury and emotional distress to the physician, that it acted with wanton disregard for the health and safety of others in promoting its product as safe, that its actions involved continuing misrepresentations rather than an isolated incident, and that they consisted of intentional trickery or deceit. There was no basis for determining whether the target of the conduct was financially vulnerable. *Bocci*, 189 Or App at 357-59.

We next discussed in *Bocci* the second *Gore* guideline, the relationship between the harm or potential harm to the injured party and the punitive damages award. We noted that the Court stated in *State Farm* that few awards that exceeded a single digit ratio would satisfy due process and that it had previously suggested that a punitive damages award of more than four times the compensatory damages might be close to the line. *Bocci*, 189 Or App at 359. We concluded, however, that the facts in *Bocci* supported an award of more than a four-to-one ratio. The defendant's conduct was much more reprehensible than an isolated incident or mere accident. On the other hand, it did not rise to the level of particularly egregious malicious acts that would justify a ratio in excess of single digits. Based on all of the considerations involved, we concluded that an award of seven times the compensatory damages was the maximum permissible. *Id.* at 360-61.[5]

We apply the same criteria in this case. Defendant's actions caused significant physical harm to plaintiff, and the jury found that defendant showed an indifference to or reckless disregard for the health and safety of its customers. There is no evidence concerning plaintiff's financial vulnerability. The conduct involved repeated actions only in the sense that defendant sold a number of fishbowls to consumers without providing adequate warnings. Although the jury found that defendant was indifferent to the consequences of its actions, there is no evidence that it acted with intentional

---

[5] We noted that there were no comparable civil penalties, so the third *Gore* guideline played no role in our decision. *Bocci*, 189 Or App at 361. The same is true in this case.

malice or engage in trickery or deceit. Thus, while defendant's actions were sufficient to justify the jury's decision to award punitive damages, they were not as egregious as were the actions of the defendant in *Bocci*. In light of the Supreme Court's focus on ratios in the usual case, we conclude that the maximum constitutionally permissible award in this case is four times the compensatory damages for which defendant is responsible, or $403,416.[6]

■       Defendant argues that, despite the evidence and the jury's verdict, no award of punitive damages is permissible because, to prove "reprehensible conduct," plaintiff must rely on evidence of actions outside of Oregon in reaching its verdict. According to *State Farm*, a "state court cannot punish a defendant for conduct that may have been legal where it occurred." 538 US at ____ , 155 L Ed 2d at 603. However, defendant does not point to any place in the record in which it raised this issue to the trial court in any fashion. The trial court admitted evidence of the three previous incidents in which defendant had been sued in other states by persons who were injured as the result of fishbowls that shattered. That evidence was relevant to show that defendant had notice of the dangers that its product posed and declined to provide warnings to its consumers. *Waddill*, 175 Or App at 299-300. Under ORAP 5.45, to preserve an issue for appeal, a litigant must first raise the issue to the trial court. The rule promotes judicial economy and ensures that opposing parties will not be denied the opportunity to meet a particular argument. *State v. Brown*, 310 Or 347, 356, 800 P2d 259 (1990). Because of defendant's failure to raise the above issue to the trial court, we decline to consider it under ORAP 5.45.

Judgment for punitive damages vacated and remanded with instructions to grant defendant's motion for a

---

[6] Plaintiff argues that we should calculate the ratio of punitive to compensatory damages based on the actual damages she suffered rather than the amount of the judgment, which took into account the jury's determination that she was 25 percent at fault. However, the judgment reflects the proportion of compensatory damages that defendant caused, which appears to be the proper basis for determining the amount of punitive damages for which it should be legally responsible.

new trial, limited to punitive damages, unless plaintiff agrees to a remittitur of punitive damages to $403,416 within 28 days of entry of the appellate judgment; otherwise affirmed.