781

Connie GROTH,
Personal Representative of the Estate of
Scott Groth, deceased,
*Respondent - Cross-Appellant,*

*v.*

HYUNDAI PRECISION AND IND. CO. LTD.,
a foreign corporation;
Hyundai Machine Tools America, Inc.,
a foreign corporation;
and Hyundai Motor Company, Inc.,
a foreign corporation,
*Appellants - Cross-Respondents,*

*and*

VISION MACHINERY,
an assumed business name of
Ellison Machinery Company Northwest,
an Oregon corporation,
*Appellant - Cross-Respondent.*

0009-09219; A121714

149 P3d 333

M. Elizabeth Duncan argued the cause for appellants - cross-respondents Hyundai Precision and Ind. Co. Ltd., Hyundai Machine Tools America, Inc., and Hyundai Motor Company, Inc. With her on the briefs was Greene & Markley, P. C.

George S. Pitcher argued the cause for appellant - cross-respondent Vision Machinery. With him on the opening brief were Eric J. Neiman and Williams, Kastner & Gibbs PLLC. With them on the reply brief was Sharon C. Peters.

Maureen Leonard argued the cause for respondent - cross-appellant. With her on the briefs was Jan Baisch.

Before Edmonds, Presiding Judge, and Ortega, Judge, and Yraguen,* Senior Judge.

YRAGUEN, S. J.

---

* Yraguen, S. J., *vice* West, J. pro tempore.

## YRAGUEN, S. J.

Defendants Hyundai Motor Company Korea, Hyundai Precision and Industrial Company, Ltd., and Hyundai Machine Tools America, Inc. (collectively referred to hereafter as Hyundai) and Hyundai's distributor, Ellison Machinery Company Northwest (Ellison), appeal after a jury awarded $1.9 million in economic damages[1] against all defendants and $8.3 million in punitive damages against Hyundai in a strict products liability action for wrongful death. The action was brought by the personal representative, Connie Groth (plaintiff), on behalf of the estate of Scott Groth (Groth), a machinist who was killed while operating a Hyundai V5 vertical industrial lathe. Defendants argue that the trial court erred in denying their motions for a directed verdict and for a new trial on the award of economic damages, and Hyundai argues that the trial court erred in submitting the issue of punitive damages to the jury, in failing to reduce the punitive damages award, and in denying Hyundai's motion for a mistrial based on statements made during closing argument. The jury also awarded $1.9 million in noneconomic damages, which the court reduced to $500,000 pursuant to ORS 31.710. Plaintiff cross-appeals, contending that the trial court improperly reduced the award of noneconomic damages. For the reasons that follow, we affirm on the appeal and on the cross-appeal.

## I.  THE APPEAL

### A.  *Submission of the Issue of Punitive Damages to the Jury*

Initially, Hyundai contends that the trial court erred in denying its motion for a directed verdict on the issue of punitive damages because plaintiff did not present clear and convincing evidence that Hyundai acted with malice or showed a reckless and outrageous indifference to a highly

---

[1] The verdict form did not segregate the various components of economic damages sought by plaintiff, which included lost future earnings, respite care, counseling, lost household services, and burial expenses. Defendants challenge the award of economic damages only to the extent that it includes lost future earnings. Because of the nature of the award, it is impossible to determine how much of the jury's award is for lost future earnings.

unreasonable risk of harm and acted with a conscious indifference to the health, safety, and welfare of others, as required by ORS 31.730(1).[2]

■■ In reviewing the trial court's denial of a motion for a directed verdict, we view the evidence and all reasonable derivative inferences in the light most favorable to plaintiff. *Williams v. Philip Morris Inc.*, 340 Or 35, 38, 127 P3d 1165, *cert granted*, 126 S Ct 2329, 164 L Ed 2d 838 (2006); *Greist v. Phillips*, 322 Or 281, 285, 906 P2d 789 (1995).[3] Groth was a machinist at Cornell Pump in Portland. He was machining a solid bronze impeller, which was being spun inside a Hyundai V5 lathe. The 50-pound impeller, which was spinning at approximately 1500 rpm, was held inside the lathe by clamps. The impeller broke free from the clamps, smashed through the plastic viewing window,[4] and struck Groth in the chest.

The evidence, when viewed in the light most favorable to plaintiff, would have permitted the jury to find that the Hyundai V5 lathe did not meet mandatory European standards or voluntary United States industry guidelines; that Hyundai "self-certified" the V5 lathe, which was permitted

---

[2] ORS 31.730(1) provides:

"Punitive damages are not recoverable in a civil action unless it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others."

[3] Hyundai contends that plaintiff "failed to meet th[e] clear and convincing standard" stated in ORS 31.730(1). We have stated that the clear and convincing standard of proof "relates to how a jury weighs the evidence, not to how a trial court assesses the capability of the evidence to establish facts." *Faber v. Asplundh Tree Expert Co.*, 106 Or App 601, 606, 810 P2d 384, *rev den*, 312 Or 80 (1991). *See also Bolt v. Influence, Inc.*, 333 Or 572, 578 n 2, 43 P3d 425 (2002) (rejecting the suggestion that the Supreme Court had approved a "clear and convincing" evidentiary standard when reviewing a motion for a directed verdict with respect to punitive damages). In any event, we conclude that the record, viewed in the light most favorable to plaintiff, contains evidence from which a jury could find, by clear and convincing evidence, that Hyundai has "shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." ORS 31.730(1).

[4] The window was constructed with tempered glass on the inside and a 6-millimeter-thick piece of Lexan plastic on the outside, which was held in a half-inch steel frame. The impeller was hurled through the lower right corner of the window, which tore loose from the steel frame.

under European standards, rather than obtaining independent certification of safety standard compliance; that Hyundai had no technical file on "self-certification" documenting risk analyses, design choices, or warnings required to use the product safely; that, if it was not possible to guard effectively against a force at the lathe's maximum capacity, as claimed by Hyundai, Hyundai failed to warn users of the residual risks or limits of safe use; that modifications that were made because of customer concerns about the retaining door were completed not to reinforce or strengthen the window, but to provide an appearance of safety; that Hyundai knew that the V5 lathe was designed to take a work piece as heavy as 2200 pounds and spin it as fast as 2000 rpm on a 24-inch chuck, which would generate significantly more impact force than the force involved in this case; that Hyundai knew that it was foreseeable that work pieces would come loose during the machining process and knew that pieces did occasionally come loose from the clamps; that, prior to Groth's death, Hyundai had to replace a V5 lathe retaining cover, which bowed out but did not break when it was struck by a work piece spun at a lower speed than the piece that was being spun at the time of Groth's death; that it was mechanically possible to design and manufacture a door that probably could have contained the impeller hurled in this case; and that Hyundai expected operators to stand in front of the window on the retaining door when running the V5 lathe.

There was also evidence that would have permitted the jury to find that, although Hyundai was at first cooperative when the Oregon Occupational Safety and Health Division (OSHA) investigated the circumstances of Groth's death and had prohibited the use of the V5 lathe until the lathe could be made safe with a stronger door, it later refused to strengthen the door and claimed that OSHA had no jurisdiction over it; that Hyundai refused to cooperate with Cornell Pump when it made independent efforts to strengthen the retaining doors on its Hyundai V5 lathes; and that Hyundai took the position that it had no obligation to warn users of the fatality and the limitations of the existing door on its V5 lathe.

The above evidence certainly would have permitted the jury to conclude, by clear and convincing evidence, that

Hyundai "has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." ORS 31.730(1). For that reason, the trial court properly denied Hyundai's motion for a directed verdict on the issue of punitive damages.[5]

## B. *Fourteenth Amendment Due Process*

Because we reject Hyundai's challenge to plaintiff's entitlement to punitive damages, we proceed to determine whether, as a matter of law, the award of punitive damages comports with federal due process. *Goddard v. Farmers Ins. Co.*, 202 Or App 79, 112, 120 P3d 1260 (2005). Defendants contend that the $8.3 million punitive damages award is unconstitutionally excessive under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, relying on *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996), and *State Farm v. Campbell*, 538 US 408, 123 S Ct 1513, 155 L Ed 2d 585 (2003).

■ The Due Process Clause of the Fourteenth Amendment prohibits the award of an excessive amount of punitive damages against a tortfeasor because, to the extent that an award is excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 US 424, 433, 121 S Ct 1678, 149 L Ed 2d 674 (2001); *Pacific Mut. Life*

---

[5] We note that Hyundai's arguments regarding the denial of the motion for a directed verdict on the issue of punitive damages focus almost entirely on the factors set forth in ORS 30.925(2). Plaintiff's brief engages those arguments. Hyundai submits that consideration of the eight factors listed in ORS 30.925(2) demonstrates that the evidence falls short of establishing that Hyundai acted with malice or showed a reckless or outrageous indifference to a highly unreasonable risk of harm or with a conscious indifference to the health, safety, and welfare of others. ORS 30.925(2) sets forth criteria for assessing the *amount of*, not entitlement to, punitive damages in product liability cases. The entitlement to punitive damages is governed by the standard set forth in ORS 31.730(1). *See* ORS 30.925(1) ("In a product liability civil action, punitive damages shall not be recoverable except as provided in ORS 31.730."). ORS 31.730 sets forth the standard as set forth above.

Even if this court were persuaded that the evidence should be viewed with respect to the criteria set forth in ORS 30.925(2), the evidence identified was sufficient for plaintiff to survive a motion for a directed verdict.

*Ins. Co. v. Haslip*, 499 US 1, 42, 111 S Ct 1032, 113 L Ed 2d 1 (1991).

■■   In *Gore*, the Supreme Court set forth three guideposts for determining whether an award of punitive damages violates the Due Process Clause of the Fourteenth Amendment: (1) consideration of the reprehensibility of the defendant's conduct; (2) the relationship between the harm or potential harm to the injured party and the punitive damages award; and (3) the disparity between the punitive damages award and the penalties (civil or criminal)[6] authorized or imposed in comparable cases. 517 US at 575, 582; *see also State Farm*, 538 US at 419, 424, 428. A defendant's wealth may be a consideration but is not a fourth *Gore* guidepost— that is, if a punitive damages award is grossly excessive under *Gore* and *State Farm*, then a defendant's wealth will not make it constitutional. However, a jury may levy a higher punitive damages award against a wealthy defendant, as long as the final punitive damages award does not exceed the constitutional limits established by the three *Gore* guideposts. *Id.*

■   The first *Gore* guidepost is the most significant: "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 US at 419. In *State Farm*, the Court set forth various criteria for considering the reprehensibility of a defendant's conduct: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evidenced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or was a mere accident. *State Farm*, 538 US at 419.

■   With respect to the second guidepost, the Supreme Court has been reluctant to identify concrete constitutional

---

[6] "Criminal penalties, however, do not help as much in determining 'the dollar amount of the award.'" *Williams*, 340 Or at 50 (quoting *State Farm*, 538 US at 428).

limits on the ratio between harm to a plaintiff (*i.e.*, compensatory damages) and the punitive damages award. In practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process. *State Farm*, 538 US at 425.

■      When analyzing the third *Gore* guidepost ("comparable sanctions"), courts must (1) identify the comparable civil or criminal sanctions; (2) consider how serious the comparable sanctions are, relative to the universe of sanctions that the legislature authorizes to punish inappropriate conduct; and (3) evaluate the punitive damages award in light of the relative severity of the comparable sanctions. *Williams,* 340 Or at 58.

Oregon courts have had the opportunity to apply the *Gore* and *State Farm* decisions on various occasions. *See Williams*, 340 Or 35; *Goddard*, 202 Or App 79; *Waddill v. Anchor Hocking, Inc.*, 190 Or App 172, 78 P3d 570 (2003); *Bocci v. Key Pharmaceuticals, Inc.*, 189 Or App 349, 76 P3d 669 (2003). This court first applied both *Gore* and *State Farm* in *Bocci*. *Bocci* involved a challenge to a jury award of $22.5 million in punitive damages and $500,000 in compensatory damages to a physician who had been misled by the defendant into believing that a prescription drug that one of his patients was taking was not toxic; the drug resulted in serious injury to the physician's patient, who in turn sued the physician. We held that the award of $22.5 in punitive damages—a 45:1 punitive damages to compensatory damages ratio—was excessive under the *State Farm* guidelines. Ultimately, we concluded that a remittitur of the punitive damages to $3.5 million (a 7:1 ratio), if accepted, would be appropriate. We reasoned:

> "In this case, there is * * * evidence of deceitful conduct involving the promotion of a prescription drug as 'safe' when it was not, which resulted in misdiagnosis and consequent severe physical injury. It is conduct that is much more reprehensible and blameworthy than an isolated incident or mere accident."

189 Or App at 360. We did not discuss the potential for other civil or criminal penalties in assessing the damages award.

In *Waddill*, a consumer was injured when a fishbowl that was manufactered by the defendant shattered while the consumer was carrying it. Applying the *State Farm* guidelines, we held that, under the Fourteenth Amendment Due Process Clause, a jury award of $1 million in punitive damages was excessive when compared to $100,854 in compensatory damages. With respect to the *Gore* guideposts, *Waddill* involved an accidental permanent physical injury and a defendant that had knowledge of three other consumers whose fishbowls had shattered under similar circumstances. We concluded that the 10:1 punitive/compensatory damages ratio was excessive and that a remittitur of punitive damages to $403,416—a 4:1 ratio—would be appropriate. Again, there was no discussion of other potential civil or criminal penalties.

*Goddard* involved an unfair insurance claims settlement action brought by the personal representative of a motor vehicle accident victim's estate. The personal representative sued the insurer for damages from an unsatisfied excess judgment that she obtained in a wrongful death action against the insured, a drunk driver whose vehicle collided with the victim. The jury verdict awarded $863,274 in compensatory damages and $20,718,576 in punitive damages, 24 times the compensatory damage award. We concluded that the punitive damages award was unconstitutionally excessive, and remanded for a new trial on punitive damages unless the plaintiff agreed to a remittitur of punitive damages of three times the compensatory damage award ($2,589,822). Although the *Goddard* case involved a death, the conduct giving rise to punitive damages concerned the insurance company's treatment of an unsatisfied excess judgment against the drunk driver. Thus, the punitive damages award involved conduct that resulted in economic damages rather than a physical injury or death. Again, we did not discuss other potential penalties.

*Williams* represents the Oregon Supreme Court's most recent pronouncement on the issue of punitive damages. It involved an action for fraud brought against a cigarette manufacturer for the smoking-related lung cancer death of her husband. The jury verdict was for $79.5 million in punitive damages (reduced to $32 million by the trial

court) and $800,000 in noneconomic damages (reduced to $500,000 by the trial court). We reversed and ordered that judgment be entered on the jury verdict on the basis that the amount of $79.5 million did not violate the Due Process Clause under the *State Farm* guidelines. *Williams v. Philip Morris Inc.*, 193 Or App 527, 563, 92 P3d 126 (2004). On review, the Supreme Court clarified aspects of what constitutes a proper review of punitive damages awards, but upheld this court's decision that the jury award of punitive damages should be affirmed. The court noted:

> "Philip Morris, with others, engaged in a massive, continuous, near-half-century scheme to defraud the plaintiff and many others, even when Philip Morris always had reason to suspect—and for two or more decades absolutely knew—that the scheme was damaging the health of a very large group of Oregonians—the smoking public—and was killing a number of that group."

*Williams*, 340 Or at 63.

The *Williams* case involved extremely egregious conduct by the defendant and thus satisfied due process considerations in spite of the fact that the case involved a much greater punitive damages/compensatory damages ratio—79.5:1—than is justified in most cases. In addition, it was the first case in which Oregon's appellate courts considered a death and comparable criminal sanctions. The court considered the fact that the actions of Philip Morris could have constituted "at least second-degree manslaughter, a Class B felony. *See* ORS 163.125(1)(a). Individuals who commit Class B felonies may face up to 10 years in prison and a fine of up to $250,000." *Williams*, 340 Or at 59-60 (footnote omitted). Corporations that commit a felony of any class may be fined up to $50,000, or required to pay as much as twice the amount that the corporation gained by committing the offense. ORS 161.655(1)(a), (3). Thus, in *Williams*, the third *Gore* factor supported a significant punitive damages award because "the possibility of severe criminal sanctions, both for any individual who participated and for the corporation generally, put [the defendant corporation] on notice that Oregon would take such conduct very seriously." *Williams*, 340 Or at 60.

■       We turn then, to the award in this case. Initially, we conclude that the award is not excessive in light of the "reprehensibility" inquiry under the first *Gore* guidepost. The harm in this case was not simply economic, as in *Goddard*; rather, it involved death. Second, as noted above, Hyundai's conduct evidenced an indifference to or a reckless disregard of the health or safety of others. Defendant knew that work pieces would occasionally come loose from the lathe clamps, that the window in the retaining door would not withstand impacts from potential forces which could be generated in the tooling process, and that lathe operators would be standing in front of the window of the defective retaining door. Moreover, based on the evidence presented, the jury could have concluded that Hyundai was not only aware of the danger created by the lathe but undertook modifications to give the *appearance* of safety, regardless of whether the lathe was in fact any safer. Thus, this case involved more than an accident waiting to happen; Hyundai knew about the risk to the lives of workers and consciously—and deceptively—ignored that risk.

With respect to the second *Gore* guidepost, we conclude that the ratio of punitive damages to compensatory damages does not render the award excessive. Initially, there is some question as to what amount should be used in this case for considering noneconomic damages—that is, should it be the $1.9 million awarded by the jury, or the $500,000 awarded by the trial court after applying the statutory cap? *See Williams*, 340 Or at 62 ("There is also some imprecision regarding what amount we should use for noneconomic damages—is it the $800,000 awarded by the trial court after applying the statutory cap?"). The ratio comparison in this case is not greatly affected by utilizing either the "uncapped" or "capped" figure—if the "uncapped" amount is used (and added to the amount of economic damages), the ratio is 2.2:1; if the "capped" amount is used (again, added to the amount of economic damages), the ratio is 3.4:1. Thus, we need not decide in this case whether the capped or uncapped compensatory damages should be used for purposes of establishing the ratio, because under either ratio, the award passes constitutional muster. Once again, this case involved the death of a worker arising from a known and disregarded risk, in

which Hyundai undertook remedial measures simply to give the appearance of added safety. It is not, as Hyundai contends, "on the extreme low end of the reprehensibility spectrum[.]"

With respect to the third *Gore* guidepost, the parties have not pointed us to any applicable civil or criminal sanctions concerning the conduct at issue in this case. However, following the reasoning in *Williams*, we note that the actions of Hyundai could have constituted, at the least, criminally negligent homicide, a Class C felony at the time of the injury. *See former* ORS 163.125(1)(a) (2001), *amended by* Or Laws 2003, ch 815, § 2. Individuals who commit Class C felonies face up to five years in prison, ORS 161.605(2), and a fine of up to $125,000, ORS 161.655(1)(a). Corporations that commit a felony of any class may be fined up to $50,000, or required to pay as much as twice the amount that the corporation gained by committing the offense. ORS 161.655(1)(a), (3). Although the conduct of Hyundai may not have been as egregious (or involved the same extended and concerted pattern) as the conduct of the defendant in *Williams*, we nonetheless conclude that Hyundai was on notice that Oregon would take its conduct "very seriously." Thus, the third *Gore* factor in this case supports a significant punitive damages award. For all of the above reasons, we conclude that the award of punitive damages in this case was not "grossly excessive." *Gore*, 517 US at 568.

Hyundai also argues that the punitive damages award in this case violates the *Gore/State Farm* prohibition on extraterritorial punishment—that is, that a state cannot punish a defendant for conduct that may have been lawful where it occurred. *Gore*, 517 US at 572; *State Farm*, 538 US at 420-21.[7] Hyundai contends that, because of the amount of the punitive damages award and because there was evidence that it sold the V5 lathes in other states, the jury must have taken that fact into account in arriving at its award of punitive damages. We will not engage in that type of speculation regarding the jury's deliberation. In any event, our review of

---

[7] For more extended discussion of out-of-state conduct, see *Williams*, 340 Or at 52-53, and *Estate of Michelle Schwarz v. Philip Morris Inc.*, 206 Or App 20, 51-57, 135 P3d 409 (2006).

the award of punitive damages on appeal is based solely on the harm to plaintiff, and, based on that harm, the award did not violate due process.

## C. *Subsequent Remedial Measures Review*

Hyundai also assigns error to the denial of its post-trial motion to reduce the punitive damages award under ORS 31.730(3). That statute provides, in part:

> "In addition to any reduction that may be made under subsection (2) of this section, upon the motion of a defendant the court may reduce the amount of any judgment requiring the payment of punitive damages entered against the defendant if the defendant establishes that the defendant has taken remedial measures that are reasonable under the circumstances to prevent reoccurrence of the conduct that gave rise to the claim for punitive damages."

In support of its argument, Hyundai asks this court to supplement the record on appeal to include evidence of the completion of the remedial measures by Hyundai that occurred after the trial court decided its motion. Accordingly, we turn first to Hyundai's motion to supplement the record.

Hyundai's motion to supplement the record on appeal is based exclusively on ORS 31.730(3). According to Hyundai, ORS 31.730(2) requires "the court" to review the award to determine whether it is within the range of damages that a rational juror would be entitled to award and "that, in addition to any remittitur resulting from the court's review under subsection (2) of ORS 31.730, that same reviewing court—be it at trial or on appeal—may reduce the punitive judgment [under ORS 31.730] upon a showing that the defendant 'has taken remedial measures * * *.'" That is, Hyundai argues that the term "the court" in ORS 31.730(3) refers to the trial court, the Court of Appeals, *and* the Supreme Court, all of which review an award under ORS 31.730. We disagree.

Whether Hyundai is entitled to present new evidence to this court under ORS 31.730(3) is a matter of statutory construction, and we resort to the methodology of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), first examining the text of the statute in context.

The term "the court" is not defined in ORS 31.730. However, from the context in which that term is used, it is apparent that "the court" is a reference to the trial court. First, ORS 31.730(3) provides that any reduction to the punitive damages award be made "upon the motion of a defendant." Although motion practice can occur on appeal, "motions" are associated more commonly with requests to the trial court.

█ Second, we assume that the "use of the same term throughout a statute indicates that the term has the same meaning throughout the statute[.]" *PGE*, 317 Or at 611 (citation omitted). As noted above, the term "the court" also appears in ORS 31.730(2). That section provides:

> "If an award of punitive damages is made by a jury, the court *shall* review the award to determine whether the award is within the range of damages that a rational juror would be entitled to award based on the record as a whole, viewing the statutory and common-law factors that allow an award of punitive damages for the specific type of claim at issue in the proceeding."

ORS 31.730(2) (emphasis added). There are no mandatory appeals of civil cases in Oregon; the mandatory review by "the court" of a punitive damages award contemplated in ORS 31.730(2) must mean review by the *trial* court.

The term "the court" also is used throughout a related statute, ORS 31.725, as a clear reference to the trial court. *See PGE*, 317 Or at 611 (context includes "other provisions of the same statute and other related statutes"). ORS 31.725(2), which governs pleading issues regarding punitive damages, provides that, "[a]t the time of filing a pleading with *the court*," the pleading may not contain a request for punitive damages. It further provides that, at any time after the pleading is filed, "a party may move *the court*" to allow the party to amend the complaint. ORS 31.725(2) (emphasis added). Similarly, ORS 31.725(3) provides circumstances in which "the court" may deny the motion to amend, and ORS 31.725(4), (5), and (6) concern the ability of "the court" to grant a continuance to allow for additional discovery. Pleading and discovery issues are associated almost exclusively with the trial court.

Any doubt as to the meaning of the term "the court" is dispelled by the legislative history of ORS 31.725(3). In response to questions about the constitutionality of reducing a jury verdict, one committee member explained that the bill would not be changing the jury's findings. Tape Recording, Senate Judiciary Committee on Civil Process, SB 482, Apr 24, 1995, Tape 42, Side A (statement of Rep Bryan Johnston). Rather, the bill involved

> "crediting things that the jury knew nothing about *that would occur in a factual hearing afterwards.* It would be a question of fact for *the judge* to determine whether or not these things existed, and if they existed, *he* would be in effect giving credits against that judgment."

*Id.* (emphasis added). The legislative history is replete with references to "the judge" but makes no mention of panels of judges, the Court of Appeals, or the Supreme Court.

Thus, we conclude that the legislature did not intend ORS 31.725(3) to authorize this court to take evidence of subsequent remedial measures that was not before the trial court. Accordingly, we deny Hyundai's motion to supplement the record on appeal.

■ We turn now to Hyundai's argument that the trial court erred in failing to reduce the verdict in light of its motion under ORS 31.730. According to Hyundai, the court simply ignored evidence of its "corrective action plan," as detailed in the affidavit and supplemental affidavit of the general manager of Hyundai Motor Company. Hyundai's conclusion that the court ignored its evidence appears to be based solely on the fact that the court did not mention the corrective action plan when it denied the motions from the bench. However, based on our review of the record, it appears that the trial court did consider the affidavits; the order denying Hyundai's motion clearly states that the court "considered the parties' oral arguments and written submissions" before denying defendants' post-trial motions.

Under the language of ORS 31.730(3), there is no requirement that the court make any reductions in punitive damages for remedial measures taken by a defendant. Rather, the statute gives discretion to the trial judge; the

court "may" reduce the amount of any judgment requiring the payment of punitive damages. At the time that the matter was presented to the trial court, Hyundai had a plan for remedial measures, but many of the measures necessary to make the lathe safer had not been completed. Moreover, given Hyundai's earlier reluctance to implement safety measures, including its reluctance to cooperate with OSHA and Cornell Pump, the trial court could have concluded that no reduction of the punitive damages award was warranted in this case even after Hyundai agreed to pursue remedial measures. On the record before us, we cannot conclude that the trial court abused its discretion.

## D. *Economic Damages*

Both Hyundai and Ellison assign error to the trial court's denial of their motions for a directed verdict on the issue of lost future earning capacity. We review the denial of a motion for a directed verdict for any evidence to support the jury's verdict. *Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003).

Essentially, defendants contend that plaintiff did not present sufficient evidence to prove future earning capacity by a "reasonable certainty," as required by *Pearson v. Schmitt*, 259 Or 439, 442, 487 P2d 84 (1971). The reasonable certainty test has been interpreted to mean that reasonable probability is required to establish future loss. *Tadsen v. Praegitzer Industries, Inc.*, 324 Or 465, 472, 928 P2d 980 (1996); *see also City of Eugene v. Monaco*, 171 Or App 681, 688, 17 P3d 544 (2000), *rev den*, 332 Or 240 (2001). "Generally * * * when a plaintiff asserts a claim for damages for future harm, the question whether those damages are recoverable is a question of fact for the jury, the answer to which will depend on the evidence adduced at trial." *Zehr v. Haugen*, 318 Or 647, 657-58, 871 P2d 1006 (1994).

Here, plaintiff sought damages for lost earning capacity with respect to two different types of income. First, plaintiff sought lost income from Groth's homebuilding business. Second, she sought lost income from a machine tool business that Groth planned to establish or, alternatively, from Groth's continued employment as a machinist. In addition, plaintiff observes that Hyundai's own expert testified

that Groth's earning capacity as a machinist would have been $64,000 per year.[8] At the close of evidence, defendants moved for a directed verdict on the "claim of loss of future earning capacity."

■ The question, for purposes of our review, is whether there is *any evidence* in the record that would support an award of damages for lost earning capacity. *Woodbury*, 335 Or at 159. The evidence of plaintiff's projected wages as a machinist with Cornell Pump, although offered by Hyundai, is evidence that would support an award of damages for lost earning capacity; thus, the trial court properly denied defendants' motions for a directed verdict on the "claim of loss of future earning capacity."

■ Ellison also argues that the trial court erroneously denied its motion for a new trial, in which it contended that the jury's award was "based on insufficient evidence and was contrary to law." Essentially, Ellison argues that there is no evidence to support the *amount* of the verdict. Ellison's earlier motion for a directed verdict did not ask the court to set an upper limit for an award of earning capacity; it argued instead that plaintiff's proof was too speculative to support *any* award. Thus, it is questionable whether Ellison's challenge to the amount of the award is properly before us. *See Mitchell v. Mt. Hood Meadows Oreg.*, 195 Or App 431, 466, 99 P3d 748 (2004) ("A motion under ORCP 64 B(5), based on '[i]nsufficiency of the evidence to justify the verdict or other decision, or that it is against law,' implicitly requires a previous motion for a directed verdict or a peremptory instruction raising the sufficiency issue."); *see also Chamley v. Gibbons*, 191 Or App 113, 120, 80 P3d 524 (2003) (motion for

---

[8] Defendants contend that there is no evidence that Groth would have continued to be employed as a machinist for Cornell Pump and that, in fact, there is testimony that he intended to be self-employed. Whether Groth, whose work ethic and work history were roundly praised, would have continued in the employment of someone else as a machinist, as he was at the time of his death, or whether he would have been able to continue as a machinist in his own machine tool business will never be known. However, to recover for lost earning capacity, a plaintiff is not required to prove that he or she has worked in the past or intended to do so in the future. *Richmond v. Zimbrick Logging, Inc.*, 124 Or App 631, 634, 863 P2d 520 (1993), *rev den*, 318 Or 459 (1994) ("Oregon, like most jurisdictions, recognizes that the impairment of a person's earning capacity is an injury distinct from a loss of earnings." (Citing *Plourd v. Southern Pac. Transp. Co.*, 266 Or 666, 682, 513 P2d 1140 (1973).)).

new trial based on insufficiency of the evidence is not reviewable). Even assuming that the sufficiency of the evidence to support the full amount of the verdict is properly before us, the record does not support such a claim of error. Based on the evidence of Groth's earning capacity from Hyundai's expert, Ellison concedes that there is as little as $183,293 in economic damages that remains unaccounted for. The jury could have used the higher work life expectancy figure offered by plaintiff's expert (ten years longer than assumed by Hyundai's expert) in reaching its verdict. Moreover, in this case, net profit (and loss) statements were shown for the four-year homebuilding business that Groth and his brother carried on while Groth was employed as a machinist. There was evidence from which the jury could have concluded that the homebuilding business was a viable ongoing venture and that profits from that business were likely to increase beyond the amount assumed by Hyundai's expert. That evidence, coupled with the evidence of Groth's earning capacity at Cornell Pump, adequately supported the jury's verdict.[9]

### E. *Mistrial*

■    Apart from any claimed errors relating to damages, Hyundai also contends that the trial court should have granted a mistrial based on statements made by plaintiff's counsel during closing argument. While discussing the amount of punitive damages, plaintiff's counsel stated:

> "The number has to get their attention. And that money goes to the court, by the way. The judge will take care of the money. Don't you worry about where the money—"

At that point, Hyundai's counsel objected and moved for a mistrial. The court denied the motion, ruling, "I don't think he got into the part that's prejudicial as to who gets what." The court then instructed plaintiff's counsel "not to go any further into where the punitives goes." Hyundai's counsel then stated, "I'm understanding the court is instructing counsel to limit his statement, conclude his sentence, and then not

---

[9] Because the evidence in the record is sufficient to support the verdict, we need not address issues relating to Groth's self-employment as a machinist. Even if those theories would not have been adequate bases for the jury's award, we have no way to determine whether the jury in fact awarded damages on those grounds. *See Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 168, 61 P3d 928 (2003).

say anything more, but we're not going to tell the jury anything. Is that right?" The court responded, "That's my ruling."

When plaintiff's closing argument resumed, plaintiff's counsel stated:

"As I was saying, ladies and gentlemen, and I will quote: 'The number has to get their attention and that money goes to the court, by the way. The judge will take care of the money. Don't you worry about where the money goes. Okay?'

"You just worry about your job. The judge will take care of that. Your job is to give Hyundai a wake-up call."

Hyundai argues that plaintiff's counsel's comments are tantamount to the instruction on the special allocation of punitive damages that the court found improper in *Honeywell v. Sterling Furniture Co.*, 310 Or 206, 797 P2d 1019 (1990). The instruction at issue in *Honeywell* told the jury that the award of punitive damages would be distributed among the prevailing party, the prevailing party's attorney, and the Criminal Injuries Compensation Account. The court held that, even though the statement was correct as a matter of law, it "distracts the jury from the appropriate line of analysis that this Court has said a jury should follow in cases involving potential awards of punitive damages[.]" 310 Or at 211. The instruction was particularly problematic because it "encouraged the jury to award punitive damages for a purpose, *viz., enhancement of the Criminal Injuries Compensation Account, that is not a reason for awarding punitive damages under Oregon law.*" *Id.* at 211-12 (emphasis added).

Even assuming that plaintiff's counsel's comments in closing argument could have the same prejudicial effect on the jury as an instruction from the court, counsel's statements in this case do not equate with the instruction in *Honeywell*. In this case, plaintiff's counsel did not identify the ultimate recipients of the punitive damages or encourage the jury to award punitive damages for another purpose. Although counsel's statements may have been close to the line, the trial court was in the best position to evaluate whether any prejudice arose from the remarks in closing argument, *see Osborne v. Hay*, 284 Or 133, 145, 585 P2d 674

(1978), and it found that counsel's comments had not prejudiced the jury. We cannot conclude that the trial court abused its discretion in that regard.[10]

## II.   THE CROSS-APPEAL

On cross-appeal, plaintiff makes two assignments of error, both of which concern the application of the limitation on noneconomic damages in ORS 31.710. That statute provides, in part:

> "Except for claims subject to ORS 30.260 to 30.300 and ORS chapter 656, in any civil action seeking damages arising out of bodily injury, including * * * death * * * of any one person including claims for loss of care, comfort, companionship and society and loss of consortium, the amount awarded for noneconomic damages shall not exceed $500,000."

We reject plaintiff's first assignment of error without discussion. In her second assignment of error, plaintiff argues that the trial court erred in dismissing her common-law wrongful death claim. A well-established line of Oregon cases holds that there was no right of action for wrongful death at common law and that wrongful death claims are purely statutory. *See, e.g., Storm v. McClung*, 334 Or 210, 222, 47 P3d 476 (2002); *Greist*, 322 Or at 290. Recently, in *Juarez v. Windsor Rock Products, Inc.*, 341 Or 160, 168, 144 P3d 211 (2006), the court was invited "to overrule its prior cases that reject a common-law wrongful death cause of action." The court declined that invitation, concluding: "[W]e need not decide whether this court's prior cases were correct. Neither do we need to resolve the question whether the common law recognized a cause of action for wrongful death." 341 Or at 169. Thus, under existing Supreme Court case law, wrongful death actions are purely statutory and exist only in the form and with the limitations chosen by the legislature. The trial

---

[10] Hyundai also argues that, because one of the jurors was a judicial assistant to a judge, and because the judicial branch was experiencing financial difficulties—a topic of interest in the news—counsel's comments probably prompted the jury to award a large amount of punitive damages, believing that the money would go to help the judicial branch. Once again, we will not engage in speculation about the jury's deliberation process.

court did not err in dismissing plaintiff's common-law wrongful death claim.

For all of the above reasons, we affirm on the appeal and the cross-appeal.

Affirmed on appeal and cross-appeal.