Argued and submitted July 3, 2008; resubmitted en banc February 10, affirmed by equally divided court March 19, 2009

LITHIA MOTORS, INC.,
dba Lithia Toyota, Lincoln, Mercury, Suzuki,
*Plaintiff-Respondent,*

*v.*

Shawn S. YOVAN,
aka Stefan Shawn Yovan,
*Defendant-Appellant.*

Shawn S. YOVAN,
aka Stefan Shawn Yovan,
*Counterclaim Plaintiff,*

*v.*

LITHIA MOTORS, INC.,
dba Lithia Toyota, Lincoln, Mercury, Suzuki,
*Counterclaim Defendant.*

Jackson County Circuit Court
010895L1; A128045

204 P3d 120

G. Jefferson Campbell, Jr., argued the cause for appellant. With him on the briefs was G. Jefferson Campbell, Jr., P.C.

Matthew Sutton argued the cause and filed the brief for respondent.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges.

PER CURIAM

Edmonds, J., concurring.

Armstrong, J., dissenting.

Sercombe, J., dissenting.

**EDMONDS, J.,** concurring.

This case involves a complaint filed by plaintiff to rescind defendant's purchase of a car from plaintiff based on a theory of mutual mistake and counterclaims by defendant for compensatory and punitive damages based on the federal Motor Vehicle Information and Cost Savings Act, 49 USC §§ 32701-32711, unlawful trade practices under ORS 646.605 to 646.656, unlawful debt practices under ORS 646.639 to 646.641, and violations of the state and federal Racketeer Influenced and Corrupt Organizations Acts. The trial court found in favor of plaintiff on its claim for rescission. The jury found in favor of defendant on his claim under the Oregon Unlawful Debt Collections Practices Act but rejected his other claims. The jury awarded defendant $500 in noneconomic damages for "emotional injury" and $100,000 in punitive damages. Plaintiff then moved for a new trial on damages or, in the alternative, remittitur to reduce the amount of the punitive damages award. The trial court granted plaintiff's motion for remittitur, ruling that the maximum constitutionally permissible punitive damages award based on the facts of the case was $2,000.

■ Defendant appeals and makes five assignments of error, including that the trial court erred when it granted plaintiff's remittitur motion. A discussion of defendant's assignments of error other than his assignment regarding the grant of plaintiff's remittitur motion would not benefit the bench, the bar, or the public, and I would affirm as to those assignments without further comment. In reviewing an award of punitive damages, this court "must resolve all disputes regarding facts and factual inferences in favor of the jury's verdict and then determine, on the facts as the jury was entitled to find them, whether the award violates the legal standard of gross excessiveness." *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 556-57, 17 P3d 473 (2001).

In December 2000, while looking for a Toyota 4Runner to purchase, defendant found a 1993 Toyota 4Runner with about 98,000 miles on it for sale by Lithia

TLM, LLC, a Medford automobile dealership.[1] Defendant contacted the dealership. In response to his specific inquiry, defendant was told by the dealership's representative that the vehicle had been repaired pursuant to a factory recall to replace the head gasket and that it had a number of other new parts. Defendant visited the dealership and was again told that the car had been repaired under the factory recall. After negotiating with the dealership, defendant purchased the car on December 2, 2000, for $13,799, with a $300 down payment and $2,000 credit for his trade-in.

At the time of the purchase, defendant insisted that he wanted to view the vehicle's service records. The dealership's salespeople told defendant that, because the purchase took place on a Saturday and the service department was closed, he could not have the maintenance records until the following Monday. They assured him that he could return the vehicle if he was not satisfied with the records. Defendant, in fact, never received the service records. Defendant also was told that the installment contract would be submitted to a lender for approval. Five days later, the retail installment contract was purchased by TranSouth Financial Corporation, and defendant was notified of that transfer.

Immediately after the purchase, defendant began to question certain aspects of the transaction. He eventually ordered a "Carfax" report on the Internet regarding the vehicle. That report revealed that there was an "odometer rollback discrepancy[.]" Specifically, the report showed mileage on one date of about 80,000, but mileage about 14 months later of some 25,500 miles less. That information led defendant to believe that the vehicle actually had been driven 25,500 miles more than the odometer indicated.

Five days after he bought the vehicle, defendant approached the dealership with the Carfax report information. The sales manager indicated her surprise regarding the report and responded that she would contact the auction yard where the dealership had purchased the vehicle. There is no evidence in the record that the dealership was aware of the

___

[1] A number of Lithia-related entities ultimately were involved in this case. Because the parties' dispute about the proper entity is not relevant to the issue that we discuss on appeal, we refer to plaintiff as "Lithia" or "the dealership."

mileage discrepancy before defendant brought it to the attention of the sales manager. In light of the information in the Carfax report, defendant became concerned about the value of the vehicle. Negotiations ensued between the parties about how to remedy the situation, but they were not fruitful.

In late December, several weeks after the purchase, defendant's counsel sent a letter to the dealership stating that defendant had elected to retain possession of the vehicle, to continue making payments on his installment contract, and to sue the dealership for damages, unless a settlement could be reached. In early January, the dealership's "Legal/ Personnel Administrator" responded to counsel's letter. She wrote:

> "Mr. Yovan may purchase the 4Runner by presenting a check in the amount of $10,587.00 to Lithia Toyota. This amount is $1,000.00 less than the current balance due on the vehicle and is a reflection of the reduced value due to the extra mileage. Lithia Toyota cannot assist Mr. Yovan in obtaining financing; therefore Mr. Yovan must present a certified check in order to retain the vehicle. In the alternative, he may return the 4Runner in exchange for his trade-in and deposit. * * *

> "If Mr. Yovan does not either return our vehicle or make full payment by 5:00 p.m. on Tuesday, January 9, 2001, Lithia Toyota will have no alternative but to take steps to recover the 4Runner. Keep in mind that Mr. Yovan has not been harmed in any way by this transaction; in fact, he has been enriched to the extent that he has had full use and benefit of the 4Runner for one month at no cost. If Lithia Toyota is forced to recover the 4Runner, Mr. Yovan's credit rating will not be affected. In the event that Lithia Toyota does recover the 4Runner, Mr. Yovan's trade-in and his deposit will be returned to him, less the cost of recovery."

Defendant's counsel responded the next day by letter, pointing out that the dealership no longer had an interest in the vehicle because the retail installment contract was owned by TranSouth. Defendant's counsel also rejected the dealership's offer of settlement. In the meantime, defendant had a telephone conversation with the dealership's used car manager. At trial, defendant testified that, during that conversation, the manager became irate when defendant told

him that he had elected to retain the vehicle. According to defendant, the manager threatened defendant with criminal prosecution for "Grand Theft Auto" if he did not return the vehicle by the end of the week and "unwind the deal." The manager, in his testimony, while denying that he ever threatened defendant, acknowledged that threatening criminal prosecution would violate the law.

Several days later, on January 2, a man showed up at defendant's house and told him that he was there to pick up the vehicle. According to defendant's testimony, the man told defendant, "I have been contracted by [the dealership] to repossess this 4Runner for non-payment." Defendant protested, informing him that his first payment was not yet due and that the installment contract was not held by the dealership.[2] Nonetheless, the man insisted that defendant move a vehicle that was blocking the 4Runner. A heated discussion ensued. After defendant asked the man to get off his property, the man told him that he would call the police and that defendant was obstructing justice.

The following day, defendant contacted TranSouth, where an employee confirmed that TranSouth held the contract and that no attempt at repossessing the vehicle should have been made. TranSouth faxed defendant a confirmation that it owned the contract. In light of the repossession attempt and the dealership's letter stating that it would "take steps to recover the 4Runner," defendant placed the vehicle in storage in mid-January 2001, where it stayed for the next three months.

About the same time, the dealership completed its repurchase of the retail installment contract from TranSouth. TranSouth sent a letter to defendant informing him of the reassignment. In the same time period, the dealership faxed a page from the sales contract to defendant's counsel, noting the following provision:

"I agree to furnish Seller any documentation necessary to verify information contained in the credit application of Buyer(s). I acknowledge that it may take a few days for

---

[2] In fact, at that time, the dealership had written a check to TranSouth to repurchase the contract, but the transaction had not been completed.

Seller to verify the credit of Buyer(s) and assign the retail installment contract/lease agreement. In consideration of Seller agreeing to deliver the vehicle, Buyer agrees that if Seller is unable to assign the retail installment contract/lease agreement to any one of the financial institutions with whom Seller regularly does business pursuant to terms of assignment acceptable to Seller, *Seller may elect to rescind the retail installment contract/lease agreement. In the event Seller elects to rescind the retail installment contract/lease agreement, I will return the vehicle immediately upon their request.*"

(Boldface omitted; emphasis added.) That communication presumably was intended to provide a basis for the dealership's position that it could rescind the contract.

In response, defendant's counsel sent the dealership another letter on January 17, reiterating that defendant was rejecting the dealership's "settlement offer of $1,000." In the letter, counsel pointed out that TranSouth had not, in fact, rejected the financing arrangement but, rather, the dealership had repurchased the contract from TranSouth. Counsel also expressed doubts in his letter that the dealership had any right to repossess the vehicle, even if it was entitled to rescind the contract under the language of the purchase agreement.

In response, the dealership, through its Legal/Personnel Administrator, made one final attempt to settle the matter. In a letter to counsel, the administrator noted first that the dealership had been unaware of the odometer rollback problem until defendant brought the problem to its attention. She also discussed the dealership's first settlement offer as well as its efforts to exchange the vehicle for another, newer 4Runner for an additional $10 per month, an offer to which defendant had not responded. Finally, she stated:

"At this point, Transsouth [*sic*] has rescinded the purchase contract. This leaves Mr. Yovan in the tenuous position of retaining physical possession of a vehicle to which he has no contractual right. Transsouth [*sic*] is willing to finance the 1993 4Runner if the amount financed is lowered by $1,000.00. The new loan will be for the same term and interest rate as the previous contract. The payments will be reduced from $319.00 per month to $287.00 per month. In

the interests of putting this matter to rest, [the dealership] is willing to reduce the purchase price by $1,000.00 to accommodate Transsouth [*sic*] and provide Mr. Yovan with a valid contract.

"* * * In the spirit of goodwill, if this matter is concluded by January 25, 2001 [the dealership] will refund Mr. Yovan an additional $500.00 for his perceived inconvenience."

Defendant rejected the offer, and the parties eventually proceeded to trial.

At trial, defendant testified that his difficulties with the dealership had caused disagreements with his wife and contributed to the breakdown of his marriage. However, defendant's former wife testified that their marriage ended when defendant "broke my nose." Defendant also called Dr. Michael Knapp, a clinical psychologist, to testify on his behalf. Knapp performed an assessment of defendant in late August 2003. Defendant reported to Knapp problems with sleep disturbance. According to the history given to Knapp,

"Regularly, for months, he was only getting about two hours of sleep a night. He was constantly worrying, constantly feeling down in mood most of the time, almost every day. He had lost interest in formerly enjoyable activities. He chronically felt fatigued, a loss of appetite, all the typical symptoms that are common to depression."

Knapp was asked whether he found any correlation between the threat of criminal prosecution and the attempt to repossess to the symptoms that defendant reported. Knapp agreed that the symptoms occurred during the same time period in which those events happened, but when asked if he could testify to a reasonable degree of medical probability that defendant suffered mental distress as a result "of the alleged violations of the Unlawful Debt Collections Practices Act in this case[,]" Knapp testified that "it was difficult to determine causality." He explained,

"I can't say that Mr. Yovan's conflicts with Lithia, and particularly his feelings of being threatened and * * * fears of being criminally prosecuted caused his distress or ruined his marriage, or caused him to lose his job, but as—as he put it, himself, he said, 'I have had a rough life, but this

pushed me over the edge.' I believe it was a significant contributing factor to his distress."

On cross-examination, Knapp was asked whether he was aware that the alleged threat and attempt to repossess occurred in December 2000 and January 2001, and he replied in the affirmative. Knapp also testified that the symptoms that defendant had described continued from that time up until when Knapp interviewed him in August 2003. When asked about other significant contributing factors to defendant's mental state in August 2003, Knapp testified that defendant had lost his job because of poor work performance, that he was having marital difficulties, and that there had been a domestic violence charge filed against him of which he was eventually acquitted. In addition, plaintiff offered evidence that defendant had been convicted of the crime of unlawful possession of a firearm/silencer committed on or about July 27, 2002, which resulted in a sentencing in December 2002 that included 90 days in jail. Also, during the same time period, defendant lost his residence through a foreclosure.

We turn to the issue of whether the trial court correctly granted plaintiff's remittitur motion and reduced defendant's punitive damages award to $2,000. In *Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or App 230, 238, 193 P3d 46 (2008), we considered a similar issue and explained:

" 'Grossly excessive' punitive damage awards violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, primarily because such damages serve no legitimate purpose and constitute arbitrary deprivations of property. *BMW of North America, Inc. v. Gore*, 517 US 559, 568, 116 S Ct 1589, 134 L Ed 2d 809 (1996) (*Gore*). In reviewing whether a punitive damage award is grossly excessive, we adhere to the following methodology set forth by the Oregon Supreme Court in *Goddard v. Farmers Ins. Co.*, 344 Or 232, 179 P3d 645 (2008). First, we review the evidence in the record in the light most favorable to the party that obtained the award to determine whether there is a factual predicate for a punitive damage award. *Id.* at 261. Second, we apply 'constitutionally prescribed guideposts to those predicate facts to determine if, as a matter of law, the award is grossly excessive.' *Id.* Those

guideposts, first identified by the United States Supreme Court in *Gore*, are:

> " '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'
>
> "*State Farm Mut. Ins. [Co.] v. Campbell*, 538 US 408, 418, 123 S Ct 1513, 155 L Ed 2d 585 (2003) (*Campbell*); *see also Goddard*, 344 Or at 261-65 (describing and applying *Gore* guideposts). Finally, if that analysis leads us to conclude that the award is grossly excessive, we then use those same guideposts to determine the maximum lawful amount of punitive damages that a rational juror could award. *Goddard*, 344 Or at 261-62."

The first guidepost requires us to assess the degree of reprehensibility of plaintiff's conduct. Under *Gore*, 517 US at 575, our consideration includes whether the harm caused by plaintiff was physical harm as distinguished from economic harm, whether plaintiff's conduct evinced an indifference or reckless disregard of the health or safety of others, whether defendant was particularly vulnerable, whether plaintiff's conduct was isolated or repeated, and whether the harm caused was the result of intentional malicious conduct. *Goddard*, 344 Or at 253. In addition, ORS 646.639(2) proscribes those acts that are considered by the legislature as unlawful debt collection practices. Those unlawful practices include threatening to use physical force against the debtor's person, family, or property; threatening arrest or criminal prosecution; threatening to seize the debtor's property without disclosing that prior court proceedings are required; using profane, obscene, or abusive language when communicating with the debtor or the debtor's family; repeatedly harassing the debtor or the debtor's family; and communicating with the debtor's employer.

In this case, plaintiff's most egregious actions were its threat to commence criminal prosecution against defendant because of his failure to voluntarily return the car and its attempt to repossess the car from defendant. It is accurate

to say that plaintiff made repeated efforts to regain the vehicle and acted intentionally in its efforts. However, defendant was not a particularly vulnerable target of plaintiff's actions; he told plaintiff's salesman that he had worked in the past "selling cars" and that "he knew how the process worked, and he didn't want to play any games." Moreover, defendant was represented by counsel during the negotiations with plaintiff and successfully resisted plaintiff's attempt to take possession of the vehicle. Those negotiations resulted in plaintiff offering to reduce the purchase price by $1,000 and pay defendant an additional $500 "for his perceived inconvenience." To the extent that plaintiff's actions violated ORS 646.639, they are reprehensible, but, on a sliding scale of reprehensibility, they fall at the lower end of the scale for the reasons noted above.

■    The second guidepost requires us to examine the ratio between the punitive damages awarded and the potential harm suffered by defendant as the result of plaintiff's actions. The proper measure of the potential harm caused by plaintiff in this case is the amount of $500 for emotional damages as found by the jury. Thus, using $500 as a denominator to the punitive damage award of $100,000, the ratio of punitive damages to compensatory damages is 200 to 1, far exceeding the four-to-one ratio established as the general ceiling for punitive damages where the only harm is financial and the putative single-digit limit for punitive damages involving personal injury. *Goddard*, 344 Or at 258-60.

There is, of course, some flexibility in determining an acceptable range where a particularly egregious act causes a comparatively small amount of compensatory injury, where the injury is difficult to detect, where the conduct causes noneconomic harm that is difficult to value, or where the conduct is extremely reprehensible. *Goddard*, 344 Or at 260-61. For example, larger punitive damage awards may be justifiable "when wrongdoing is hard to detect (increasing the chances of getting away with it)." *Exxon Shipping Co. v. Baker*, ___ US ___ , 128 S Ct 2605, 2622, 171 L Ed 2d 570 (2008). Defendant's claim for damages for emotional distress that arose out of plaintiff's efforts to unwind a transaction in which it had unknowingly sold

defendant a vehicle with an erroneous odometer reading is not the kind of claim that is difficult to value. A major issue at trial was whether defendant's sleep deprivation problems, the breakup of his marriage, and his loss of employment were caused by the dispute with plaintiff. Those kinds of causation issues are regularly decided by Oregon juries. That leaves the issue of whether the award of a comparatively small amount of compensatory damages in this case justifies a higher ceiling of punitive damages than might otherwise exist.

In this case, plaintiff's conduct was on the low end of the scale of reprehensibility. Consequently, it cannot be said that the conduct was "particularly egregious" so as elevate the due process ceiling in order to provide an incentive to bring an action. Although plaintiff's attempts to regain possession of the vehicle were found by the jury to be in violation of ORS 646.639, they were not particularly egregious when compared to other illegal debt collection efforts that the statute contemplates. Moreover, defendant sought an award of $150,000 for the emotional harm that he claimed was caused by plaintiff's conduct. Instead, the jury found his damages for emotional harm caused by plaintiff to be $500. The award of $500 is not substantial in the sense that it is not a large amount, but it is substantial in the sense that it has actual value in excess of the $200 nominal damage award provided for in ORS 646.641(1) in the event of a violation of the act. In addition, ORS 646.641(2) provides for an award of reasonable attorney fees to the prevailing party. Thus, the legislature has provided through other means an incentive to bring an action when the award of actual damages is comparatively small, leaving me to conclude that, in the absence of particularly reprehensible conduct, there is no support for a higher ratio in this case than might ordinarily be applicable.

We are also mindful of other punitive damage awards approved by this court with regard to personal injury for purposes of determining a proper ratio between the punitive damages awarded and the potential harm suffered. In *Waddill v. Anchor Hocking, Inc.*, 190 Or App 172, 78 P3d 570 (2003), we approved a four-to-one ratio in a personal injury case involving products liability when a fishbowl shattered, slashing the plaintiff's ulnar nerve and severing a tendon in

the plaintiff's left wrist. The jury in that case found that the defendant showed an indifference to or reckless disregard for the health and safety of its customers through the sale of a number of fishbowls without providing written warnings, although the defendant was aware of three other incidents in which customers were injured by fishbowls that shattered. The defendant did not retain records of those incidents or attempt to use them to improve the safety of its product. Unlike in *Waddill*, this case involves only alleged emotional harm. Although "fact matching" with other cases is an inexact process because of the varying circumstances in each case, our comparison of the facts in this case with the facts in *Waddill* demonstrates that the facts in this case are less egregious than existed in that case.

The next *Gore* guidepost requires us to consider comparable criminal or civil sanctions by identifying what other sanctions for plaintiff's conduct could be available, how serious those sanctions are to the universe of sanctions that are available to punish a wrongdoer, and the amount of punitive damages awarded by the jury in light of the severity of comparable sanctions. *Goddard*, 340 Or at 58. The most comparable sanction created by the legislature is in ORS 646.641(1), which provides a remedy in the amount of actual damages or $200, whichever is greater. Here, the jury awarded actual damages of $500 instead of the statutory minimum of $200. In light of the legislature's enactment of the Unlawful Debt Collection Practices Act, I cannot describe comparable sanctions as particularly severe or as mild, trivial, or nonexistent. *Hamlin*, 222 Or App at 247. I conclude, therefore, that the analysis under the third guidepost neither militates against nor supports a more substantial punitive damage award than the four-to-one ratio imposed by the trial court.

Based on the above determinations, I conclude that the jury's punitive damage award of $100,000 is grossly excessive. The next step is to determine the highest amount that defendant can recover that still comports with due process. That task requires this court to consider, for purposes of the *Gore* guideposts, where plaintiff's conduct falls on the scale of conduct that could warrant the award of punitive

damages. *Goddard*, 344 Or at 262. I return to the considerations under the second and the third guideposts. As noted above, I have no basis to compare legislative sanctions, because the jury's award is the sanction contemplated by the legislature. The degree of reprehensibility of plaintiff's conduct, while significant, is not egregious. As to the amount of emotional harm caused by plaintiff's conduct, the jury's verdict informs me that the emotional damage to defendant caused by plaintiff is relatively minimal, particularly in comparison to the award approved in *Waddill*. Balancing all of the relevant factors discussed above, I conclude that any amount in excess of a four-to-one ratio would constitute a grossly excessive award that would serve no legitimate purpose and if upheld, would constitute an arbitrary deprivation of plaintiff's property. Accordingly, I would hold that the trial court did not err in reducing defendant's punitive damage award to $2,000 or a four-to-one ratio.

Both of the dissents take issue with the application of a four-to-one ratio in this case. Judge Armstrong opines that "plaintiff's conduct strikes me as remarkably egregious and high handed." 226 Or App at 590 (Armstrong, J., dissenting). He would apply a 50-to-one ratio because a four-to-one ratio does not provide, in his view, an adequate deterrence to future conduct by plaintiff such as the conduct that occurred here. On the other hand, Judge Sercombe "agree[s] that plaintiff's conduct is not very reprehensible in the universe of cases in which juries have awarded punitive damages." 226 Or App at 598 (Sercombe, J., dissenting). Nonetheless, Judge Sercombe opines that "[t]he concurrence's answer—that any amount over $2,000 is 'grossly excessive' and violates plaintiff's constitutional rights—is hard to square with the goal of punitive damages to punish and deter wrongdoers." *Id.* Thus, Judge Sercombe would allow a nine-to-one ratio.

The reasoning of the dissents is inconsistent with the jurisprudence of the United States Supreme Court on the subject. The dissents and I agree that generally punitive damage awards serve the same purpose as criminal penalties—they may be imposed to further a state's interest in punishing unlawful conduct and deterring its repetition. However, I disagree on what is the substantive constitutional

limit on the punitive damage award in this case and the application of the general rule that, to the extent that an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of the tortfeasor's property in violation of the Due Process Clause. *Pacific Mutual Life Insurance Company v. Haslip*, 499 US 1, 111 S Ct 1032, 113 L Ed 2d 1 (1991). To ensure compliance with the Due Process Clause, appellate review must be based upon an "application of law, rather than a decisionmaker's caprice." *Gore*, 517 US at 587 (Breyer, J., concurring). In *Campbell*, 538 US at 425-26, the Court explained,

> "We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip*, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 US at 23-23. We cited that 4-to-1 ratio again in *Gore*, 517 US at 581. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, triple, or quadruple damages to deter and punish. *Id.* at 581 and n 33. While these ratios are not binding, they are instructive. They demonstrate what should be obvious. Single-digit multiplies are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution * * *."

With respect, the dissents' reliance on ratios greater than four to one is based on decisionmaker's caprice rather than the application of the Court's jurisprudence. The Court's jurisprudence provides for a higher ratio than four to one only where "a particularly egregious act has resulted in only a small amount of economic damages," and in "cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 US at 582. Thus, as the Court observed in *Exxon*, "when the value of injury and the corresponding compensatory award are small (providing low incentives to sue), *see, e.g.*, [*Gore*, 517 US at 582] ('[L]ow awards of compensatory damages may

properly support a higher ratio * * * if, for example, a particularly egregious act has resulted in only a small amount of economic damages.')[,]'" a higher ratio may reflect the due process ceiling. ___ US at ___ , 128 S Ct at 2622. In other cases, where compensatory damages are substantial in light of the actual harm caused by the wrongdoer, "then a lesser ratio, perhaps only equal to compensatory damages can reach the outermost limit of the due process guarantee." *Campbell*, 538 US at 425.

Judge Sercombe's dissent focuses on the words "single-digit limit" in the Court's jurisprudence and deduces that a higher single-digit limit is constitutionally permissible under the circumstances of the case while at the same time conceding that plaintiff's conduct was "not very reprehensible in the universe of cases in which juries have awarded punitive damages." 226 Or App at 598 (Sercombe, J., dissenting). That reasoning runs afoul of the Court's admonition that the due process ceiling can be increased only where "the economic damages are relatively small in relation to the theoretical injury, where the injury is difficult to detect, where the conduct causes noneconomic harm that is hard to value, or where the conduct is 'extraordinarily' reprehensible." *Goddard*, 344 Or at 261. Here, defendant sought *noneconomic* damages for his mental anguish caused by plaintiff's conduct. Also, the injury is not difficult to detect, and the noneconomic harm is not hard to value. A claim for mental suffering is a common allegation in personal injury cases that is evaluated routinely by Oregon juries. Finally, as concluded by Judge Sercombe, plaintiff's conduct is not "extraordinarily reprehensible." It is evident therefore that the circumstances of this case do not fall into the categories of the Court's exceptions to a four-to-one ratio.

Judge Armstrong's dissent takes a different tack. He proposes a judge-created exception to the Court's jurisprudence prompted by his belief that there should be a special rule when "confronted with a small compensatory award." 226 Or App at 588 (Armstrong, J., dissenting). Importantly, Judge Armstrong can point to no Court precedent that provides for such an exception for noneconomic damage awards; in contrast, the Court relied on its own precedents and 700 years of history regarding awards of double, triple, or

quadruple damages to punish and deter wrongdoers. Moreover, Judge Armstrong's proposed rule would operate to reward plaintiffs with large punitive damage awards when they are unsuccessful in proving what they allege to have been the actual damages incurred as the result of the defendant's wrongdoing. This case is exemplary: plaintiff sought an award of compensatory damages in the amount of $150,000 on his Unlawful Debt Collection Practices Act claim and in the amount of $250,000 on his Unlawful Trade Practices Act; the jury awarded him $500 in compensatory damages on his Unlawful Debt Collection Practices Act claim and rejected his Unlawful Trade Practices Act claim.[3] It is counterintuitive to reward a plaintiff with a greater proportional recovery of punitive damages than other similarly situated plaintiffs when he or she has recovered a significantly lesser amount of compensatory damages than the amount the plaintiff claims to have incurred.

Brewer, C. J., and Landau, Haselton, and Wollheim, JJ., join in this concurrence.

**ARMSTRONG, J.,** dissenting.

If this were a case in which the jury's compensatory damage award was substantial, I would agree with the basic approaches taken by the concurrence and by Judge Sercombe to establish the due process limit on punitive damages in this case. Indeed, the "single-digit ratio" formulation of punitive damages can be useful in gauging the proportionality of the wrongful conduct to the punishment when the compensatory damage award is significant. However, the ratio loses its usefulness when we are confronted with a small compensatory award, as we are here. As Judge Sercombe notes in his dissent, the primary purpose of a punitive damage award is *to deter* wrongful conduct. 226 Or App at 598 (Sercombe, J., dissenting) (citing *State Farm Mut. Ins. v. Campbell*, 538 US 408, 416, 123 S Ct 1513, 155 L Ed 2d 585 (2003) (*Campbell*)). Given that, a punitive damage award based on applying the single-digit default ratios to a small award of compensatory

---

[3] In this case, the jury found that plaintiff had not committed any unlawful trade practices. Curiously, Judge Armstrong would award $25,000 in punitive damages against plaintiff based on the legislature's imposition of a penalty for acts that, according to the jury's verdict, plaintiff did not commit.

damages falls far short of achieving that purpose. Rather, this case warrants a punitive damage award higher than $2,000, produced by the four-to-one ratio that the concurrence concludes is appropriate, or $4,500, based on the nine-to-one ratio advanced by Judge Sercombe. Hence, I respectfully dissent.

Fundamentally, deterrence has much less meaning when we apply the suggested single-digit ratios to smaller awards. Accordingly, the Supreme Court has routinely discouraged courts from taking a purely categorical approach to determining the constitutionality of punitive damage awards. *See BMW of North America, Inc. v. Gore*, 517 US 559, 582, 116 S Ct 1589, 134 L Ed 2d 809 (1996) ("Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award."); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 US 1, 18, 111 S Ct 1032, 113 L Ed 2d 1 (1991) ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] for reasonableness * * * properly enter[s] into the constitutional calculus.").

Likewise, the Oregon Supreme Court has recognized the need for flexibility in this area in order to preserve the deterrent function of punitive damages. As the concurrence notes, 226 Or App at 582-83 (Edmonds, J., concurring), the court in *Goddard v. Farmers Ins. Co.*, 344 Or 232, 261, 179 P3d 645 (2008), identified four factors that courts may consider in justifying a higher punitive damage award. Three of those factors—a particularly egregious act coupled with comparatively low economic damages, a difficult-to-detect injury, or a difficult-to-value noneconomic harm—embody a concern with accurately reflecting the harm caused by wrongful conduct in instances where the compensatory damage award does not. As we concluded in *Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or App 230, 246, 193 P3d 46 (2008), the principle behind those factors addresses "the inherent purposes of punitive [awards] to penalize and deter" and thus "permit[s] a more expansive award than that dictated by the ratio analysis in those circumstances."

In this case, we confront an issue similar to that discussed in *Hamlin*. The jury determined that defendant's noneconomic damages are $500. Although people might reasonably disagree as to what constitutes a "small" award, most, if not all, would agree that $500 is a small amount in the universe of compensatory damages. Additionally, plaintiff's conduct strikes me as remarkably egregious and high handed. Defendant was not in default on a debt to plaintiff—in fact, there was no debt for plaintiff to collect—yet plaintiff intentionally manipulated the process to gain leverage with defendant by making repeated efforts to repossess the vehicle, including sending a collection agency to defendant's home to take a truck to which it had no right, and threatening defendant with criminal prosecution for failing to voluntarily surrender it. That conduct was not any less reprehensible due to defendant's familiarity with auto sales, retention of an attorney early in the dispute, or successful evasion of plaintiff's illegal repossession efforts. The fact that the jury found only $500 of the $150,000 in emotional harm that defendant sought goes to the issue of defendant's damages, *not* plaintiff's conduct. What is more telling, in my view, is that the jury determined that plaintiff had engaged in very offensive behavior, and that that behavior warranted a punitive damage award of $100,000.

Under those circumstances, the fundamental function of a punitive damage award—deterrence—should still count, and the ratio guidepost should not operate to unduly constrain the underlying function of such an award. The primary dispute between the concurrence and Judge Sercombe is whether the damages are economic or physical, and, hence, which threshold ratio should be applied to the compensatory damages to determine a proper punitive damage award. Respectfully, they miss the point—the resulting awards of $2,000 (based on a four-to-one ratio) or $4,500 (based on a nine-to-one ratio) simply do not adequately serve to deter the wrongful conduct.

Rather, it is the third guidepost, under which we consider civil sanctions authorized in comparable cases, that should provide more guidance in this instance than that provided by ratio analysis. As the concurrence correctly

explains, plaintiff violated the unlawful debt collection practice statute, ORS 646.639, and ORS 646.641(1) creates a private right of action with a nominal damage award of $200 for such a violation. 226 Or App at 583 (Edmonds, J., concurring). In light of those statutes, the concurrence concludes that the comparable-sanctions guidepost neither supports nor militates against a larger award of punitive damages than the ratio analysis would otherwise permit. *Id.* at 14. Although I do not disagree with that reasoning based on ORS 646.641(1), I believe that that analysis is incomplete.

The third guidepost does not limit our review to civil penalties authorized or imposed in *identical* cases; rather, it requires us to consider "civil penalties authorized or imposed in *comparable* cases." *Campbell,* 538 US at 418 (emphasis added). The statutes on unlawful debt collection practices are comparable to the statutes on unlawful trade practices. Both groups of statutes are focused on protecting consumers against improper business and trade practices, and both provide the same private enforcement remedies for violations of them. *Compare* ORS 646.639 *and* ORS 646.641 *with* ORS 646.607, ORS 646.608, *and* ORS 646.638. However, the unlawful trade practice statutes also authorize the state, through district attorneys and the Attorney General, to bring actions to enjoin unlawful trade practices, ORS 646.632, and to recover civil penalties up to $25,000 for each trade practice violation. ORS 646.642.[1]

The legislature's decision to establish a penalty for unlawful trade practice violations up to $25,000 for each violation affects the due process analysis that applies to punitive damage awards on unlawful trade practice claims involving small compensatory awards. The legislature's decision to establish such a penalty effectively means that, although punitive damage awards greater than $25,000 on unlawful

---

[1] Currently, violations of the unlawful debt collection practice statutes are not subject to state enforcement under ORS 646.642. As of this writing, however, the Attorney General is supporting and the 2009 Oregon Legislative Assembly is considering Senate Bill (SB) 328 (2009), which would make the unlawful debt collection practice statutes subject to the same public enforcement regime as the unlawful trade practice statutes. Hence, if SB 328 is enacted, violations of the unlawful debt collection practice statutes will be subject to a civil penalty up to $25,000 per violation.

trade practice claims may be permitted without violating due process, an award of $25,000 on such a claim cannot violate due process.

I believe that that principle applies to unlawful debt collection practice claims even though the unlawful debt collection practice statutes do not include public enforcement and civil penalty provisions. The unlawful debt collection and unlawful trade practice statutes and claims are sufficiently comparable to lead me to conclude that a punitive damage award of $25,000 in a case such as this, involving a small compensatory award, does not violate due process. In other words, I conclude that the legislative policy to permit civil penalties up to $25,000 for unlawful trade practice violations provides a more appropriate proportionality gauge for punitive damage awards in this and comparable circumstances— where egregious, prohibited conduct yields a small amount of compensatory damages—than does the single-digit formula. That conclusion comes closer to respecting the jury's judgment as to the appropriate measure of punishment for the unlawful conduct at issue, and it preserves the deterrent function of punitive damages, which the legislature expressly made applicable to both unlawful debt collection *and* unlawful trade practice claims. *Compare* ORS 646.641(1) *with* ORS 646.638(1).[2]

For those reasons, I conclude that an award of $25,000 in punitive damages would not offend due process. Accordingly, I dissent.

Schuman and Rosenblum, JJ., join in this dissent.

**SERCOMBE, J.,** dissenting.

Despite the fact that the jury awarded defendant $100,000 in punitive damages, the concurrence holds that any award of punitive damages in this case in excess of

---

[2] The legislature's decision to authorize punitive damage awards for both unlawful debt collection *and* unlawful trade practice claims bolsters my conclusion about the due process limit on the punitive damage award in this case. If, as I believe, a $25,000 punitive damage award on an unlawful trade practice claim involving a $500 compensatory damage award would not violate due process, then I do not see how a $25,000 punitive damage award would violate due process in this case.

$2,000 is grossly excessive and thus would violate plaintiff's right to due process of law under the United States Constitution. In my view, due process prohibits a punitive damages award in excess of $4,500.

I agree with much of the concurrence's analysis. For instance, I agree that plaintiff's conduct in this case falls on the lower end of the reprehensibility scale. I also agree that there are no special circumstances in this case that would justify a punitive damages award that would exceed the compensatory damages by more than a single-digit ratio. Rather, my disagreement with the concurrence is a narrow one: In my view, the concurrence errs in holding that due process will allow only a four-to-one ratio of punitive to compensatory damages in this case. For the reasons explained below, due process concerns cannot support a reduction of the jury's award of $100,000 to less than $4,500—a nine-to-one ratio of punitive to compensatory damages, within the "single-digit ratio" countenanced by *Goddard v. Farmers Ins. Co.*, 344 Or 232, 258, 179 P3d 645 (2008).

I begin with general principles. In *Goddard*, the Supreme Court explained:

"Punitive damages awards that are 'grossly excessive' violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, because excessive punitive damages serve no legitimate purpose and constitute arbitrary deprivations of property. *BMW of North America, Inc. v. Gore*, 517 US 559, 568, 116 S Ct 1589, 134 L Ed 2d 809 (1996). Excessive punitive damages also implicate the requirement of fair notice that is enshrined in the Due Process Clause: Due process dictates that 'a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a state may impose.' *Id.* at 574."

*Goddard*, 344 Or at 251. The broad question posed by this case is whether the trial court's reduction to a four-to-one ratio of punitive to compensatory damages was required by the Due Process Clause of the Fourteenth Amendment.

In *Goddard*, the Oregon Supreme Court reiterated the three "guideposts" originally set out by the United States

Supreme Court in *Gore* for determining whether a punitive damages award comports with due process:

> " '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' "

*Id.* (quoting *State Farm Mut. Ins. Co. v. Campbell*, 538 US 408, 418, 123 S Ct 1513, 155 L Ed 2d 585 (2003) (*Campbell*)). The court in *Goddard* explained that "[i]t is clear that that analysis must begin, at least, with the aforementioned guideposts * * *. It is less clear how those guideposts can yield a specific numerical figure that represents the maximum constitutionally permissible award." 344 Or at 256-57.

The first guidepost, reprehensibility, includes whether the harm caused was physical as opposed to economic; whether the tortious conduct evidenced indifference to or reckless disregard of the health or safety of others; whether the target of the conduct had financial vulnerability; whether the conduct involved repeated actions; and whether the harm was the result of intentional malice, trickery, deceit, or mere accident. *Id.* at 253. " 'The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.' " *Id.* (quoting *Campbell*, 538 US at 419). As the court explained in *Goddard*, the first guidepost "does not generate numerical answers at all, because the guidepost itself, and the 'subfactors' that go into it, are all qualitative, not quantitative." 344 Or at 257. Nonetheless, "we may compare the level of reprehensibility exhibited in various cases, and that comparison may lead us to a conclusion that the constitutionally permissible limit in a particular case is 'high' or 'low,' relative to the limit in another case." *Id.*

The third guidepost—which requires the court to consider comparable civil and criminal penalties—"also fails to provide a quantitative measuring stick." *Id.* The Oregon Supreme Court has explained that comparable sanctions can

"be used as a basis for comparing one punitive damages award to another, and not as a direct predictor of the constitutional limits of an individual punitive damages award." *Id.* That is, the guidepost may militate against a significant punitive damages award if the state's comparable sanctions are mild or trivial, whereas the guidepost will support a more significant punitive damages award when the state's comparable sanctions are severe. *Id.*

The second guidepost—the ratio between punitive damages and actual or potential harm to the plaintiff— "comes closest to providing numerical limits." *Id.* The court observed in *Goddard* that,

> "[a]lthough the Court has professed its reluctance to 'identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award,' *Campbell*, 538 US at 424, it has also, at various times, alluded to specific numerical ratios. In [*Pacific Mutual Life v.*] *Haslip*, [499 US 1, 23-24, 111 S Ct 1032, 113 L Ed 2d 1 (1991)], for example, the Court stated that a punitive damages award that is more than four times the compensatory damages award 'may be close to the [constitutional] line.' In *Gore*, 517 US at 581, the Court interpreted a prior decision, *TXO Production Corp. v. Alliance Resources Corp.*, 509 US 443, 113 S Ct 2711, 125 L Ed 2d 366 (1993), as suggesting that the ratio could not exceed ten to one. In *Campbell*, 538 US at 425, the Court suggested that, although a higher ratio may be justified when compensatory damages are small, '[w]hen compensatory damages are substantial, * * * a * * * ratio [that is] perhaps only *equal* to compensatory damages * * * can reach the outermost limit of the due process guarantee.' And, in the same opinion, the Court indicated that due process may be violated by 'exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree.' *Id.* at 425."

344 Or at 257-58 (emphasis and ellipses in *Goddard*). The court in *Goddard* continued:

> "But the Court also has conceded that the single-digit ratio may be exceeded in certain circumstances. It has indicated, for example, that higher ratios may be appropriate if 'a particularly egregious act has resulted in only a small amount of economic damages,' and in 'cases in which the

injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.' *Gore*, 517 US at 582. This court has identified one other circumstance in which an award that exceeds a single-digit ratio between punitive and compensatory damages might satisfy due process. In *Williams* [*v. Philip Morris*, 340 Or 35, 63, 127 P3d 1165 (2006), *vac'd on other grounds*, 549 US 346, 127 S Ct 1057, 166 L Ed 2d 940, (2007), *on remand*, 344 Or 45, 176 P3d 1255, *cert granted in part*, 128 S Ct 2904 (2008)], we held that 'extraordinarily reprehensible' conduct on the part of the defendant may provide a basis for overriding concerns that may arise from an award that exceeds a single-digit ratio."

344 Or at 259 (footnote omitted).

The court in *Goddard* then summarized its approach to the guideposts:

"In sum, the second guidepost, although far from perfect, does provide at least a *rough* numerical baseline for calculating a maximum constitutionally permissible punitive damages award in a given case. Specifically, it suggests that due process normally will not permit a punitive damages award in excess of a single-digit ratio to the compensatory damages award.

"Once that rough numerical reference point is established, the other guideposts come into play. As we have suggested, the first (reprehensibility) guidepost primarily is a comparative tool: If the level of reprehensibility exhibited in a case is high relative to other cases, then so will be the constitutionally permissible punitive damages award. The third guidepost also is comparative: If the comparable civil sanctions for certain conduct is high relative to other civil sanctions, then that fact may justify an upward adjustment in the constitutionally permissible amount of punitive damages."

344 Or at 259 (emphasis in original).

The concurrence goes astray when it uses a four-to-one ratio as its starting point in determining the maximum punitive damages award that due process will permit. Rather, the "rough numerical reference point" that the Supreme Court has established in a noneconomic injury case such as this one is nine to one. In my view, because nothing in

the record in this case requires an adjustment to that initial amount, due process requires only a reduction of the $100,000 punitive damages award to $4,500.

The court in *Goddard* observed that, "as a very general rule of thumb, the federal constitution prohibits any punitive damages award that significantly exceeds four times the amount of the injured party's compensatory damages, *as long as the injuries caused by the defendant were economic, not physical.*" *Id.* at 260 (emphasis added). We recently reiterated that rule:

> "[A]s a general rule, due process will not permit a punitive damage award exceeding a single-digit ratio to the compensatory damage award. Further, *if the injuries that defendant has caused are strictly economic*, a punitive damages award generally may not significantly exceed four times the amount of the injured party's compensatory damages."

*Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or App 230, 241, 193 P3d 46 (2008) (emphasis added; citations omitted). Here, the jury explicitly found that defendant did not suffer economic injuries, but that he suffered emotional injury. Thus, the four-to-one ratio that the trial court employed—and that the concurrence endorses—was not required as a matter of law. The question remains, of course, what ratio due process will support.

As noted, in *Goddard*, the court described the dichotomy between the four-to-one ratio and the nine-to-one (or single-digit) ratio as a dichotomy between economic injuries and noneconomic injuries. 344 Or at 260. The *Goddard* court set the nine-to-one ratio as the default for noneconomic (which presumably includes emotional) injuries: "[D]ue process normally will not permit a punitive damages award in excess of a single-digit ratio to the compensatory damages award." *Id.* at 259. The court explained that noneconomic injuries traditionally have been punished more severely than have economic injuries: "By long tradition, and reinforced by existing legal standards at all levels of government, conduct that causes or creates a risk of physical harm to persons is punished more harshly than conduct that causes or potentially causes economic harm." *Id.* at 259-60. "[T]he limit," the

court concluded, "must be significantly lower for conduct that causes or risks only economic injury." *Id.* at 260.

Accordingly, in determining the maximum amount of punitive damages that due process will allow, the rough numerical reference point should be $4,500, or nine times the amount of compensatory damages awarded in this case. The concurrence, although noting that the four-to-one ratio guidepost is relevant "where the only harm is financial," 226 Or App at 582 (Edmonds, J., concurring), and despite the fact that the jury found by a special verdict that defendant did not suffer economic harm, nonetheless treats that ratio as the relevant one. As noted, that is where the concurrence goes astray.

It is important to remember that the jury awarded defendant $100,000 in punitive damages. Our task is not to review that award *de novo*, but to determine the maximum amount that due process will permit. *See Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 555, 17 P3d 473 (2001) ("In Oregon, calculating punitive damages is the function of the jury."). The concurrence's answer—that any amount over $2,000 is "grossly excessive" and violates plaintiff's constitutional rights—is hard to square with the goal of punitive damages to punish and deter wrongdoers. *See Campbell*, 538 US at 416 (punitive damages "are aimed at deterrence and retribution"). I agree that plaintiff's conduct is not very reprehensible in the universe of cases in which juries have awarded punitive damages. Yet, no court of which I am aware has used "low reprehensibility" as the basis to decrease the amount of punitive damages below a single-digit ratio to compensatory damages. Nor am I aware of any court that has determined that a $4,500 punitive damages award constitutes an "extreme result[ ] that jar[s] one's constitutional sensibilities." *Pacific Mut. Life Ins. Co.*, 499 US at 18. To reduce the award, as the concurrence does, to $2,000 "would exceed our constitutional role." *Goddard*, 344 Or at 275; *see Parrott*, 331 Or at 557 (A reviewing court "must give effect, to the extent practicable, to the state-protected right to have a jury determine the amount of a punitive damages award."); *id.* at 558 (court must reduce excessive award to "highest lawful amount").

In sum, I would hold that due process permits an award in this case of no more than $4,500.

Ortega, J., joins in this dissent.